**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 7, 2019**

# In the Court of Appeals of Georgia

A18A1927. WOODALL v. JOHNSON.                    DO-070

DOYLE, Presiding Judge.

Beau Phillip Woodall ("the father") appeals an order from the Superior Court

of Henry County granting James W. Johnson's ("the stepfather") stepparent petition

to adopt the father's son, B. M. W., and terminating the father's parental rights to the

child. The father argues that: (1) the superior court abused its discretion by denying

his motion to supplement the record; (2) the court erred by failing to set forth

sufficient facts to authorize termination of parental rights as required by former

OCGA §§ 19-8-19 and 19-8-18[1]; (3) there was insufficient evidence to support the

---

[1] We note that a new version of Article 1 of Chapter 8 of Title 19 (including
OCGA §§ 19-8-6, 19-8-10, 19-8-18, 19-8-19, and 19-8-26) with substantive changes
was enacted in 2018, with the changes effective September 1, 2018. See Ga. L. 2018,
p. 285, § 4-1; p. 474. Because the petition and judgment in this case predate the
enactment of the revised Code version, we apply the prior version in effect at the

termination of his parental rights under former OCGA § 19-8-10; and (4) the trial court erred by failing to properly apply the clear and convincing evidence standard. For the reasons that follow, we reverse.

"On appeal from an order severing parental rights based on an adoption petition, we view the evidence in the light most favorable to the trial court's findings and determine whether a rational trier of fact could have found by clear and convincing evidence that the biological parent's rights have been lost."[2]

B. M. W. was born on September 29, 2010, as issue of the marriage between the father and Lauren Alicia Johnson ("the mother"). On January 7, 2013, the parents divorced, and the superior court entered a final order requiring the father to pay $400 per month in child support and incorporating a parenting plan. On May 3, 2014, the mother and the stepfather married.

---

time. See *Nathans v. Diamond*, 282 Ga. 804, 808-809 (654 SE2d 121) (2007) ("[T]the rule is that laws that affect substantive rights may operate prospectively only. Substantive law is that law which creates rights, duties, and obligations. Procedural law is that law which prescribes the methods of enforcement of rights, duties, and obligations.") (punctuation omitted); *Nathans v. Diamond*, 235 Ga. 820, 821 (221 SE2d 813) (1976) (noting that "[a]doption is a right which did not exist at common law [and is purely] statutory in nature").

[2] (Citations omitted.) *Smallwood v. Davis*, 292 Ga. App. 173 (1) (664 SE2d 254) (2008).

On September 10, 2015, the superior court entered an order finding the father in contempt and requiring him: to pay $7,450 in back support and $562 for unpaid medical expenses; to comply with a parenting schedule recommended by counselor Pam McMichen; and to submit to a drug screen by July 24, 2015, with the caveat that the father "shall have no visitation with [B. M. W.] until he has provided a clean . . . drug test to the [mother]." McMichen's parenting plan set forth a detailed schedule, which included initial supervised visitation gradually working up to unsupervised overnight visits twice a month after over a year. As a sub-set of the final part of the schedule providing for overnight visits, the parenting plan provided, among other things, that: "[s]hould problems arise," the mother should notify her attorney or McMichen and that "[s]hould problems occur during visits," the mother could take B. M. W. for counseling at her discretion; the father "shall participate in individual counseling throughout the step down process; and "[t]he [father] shall attend counseling at least once a week."

On January 25, 2017, the stepfather filed a petition for adoption, attaching thereto the mother's written consent pursuant to former OCGA § 19-8-26 (l). The stepfather alleged that the written voluntary surrender of the father was not necessary because the father,

for a period of one year or longer immediately prior to the filing of the petition for adoption, without justifiable cause ha[d] failed to communicate or make a bona fide attempt to communicate with that child in a meaningful, supportive parental matter [sic] and ha[d] further failed to provide care and support of the child as required by law or judicial decree as contemplated in OCGA § 19-8-10.

The father filed an objection to the adoption petition, alleging that he had "purged all issues of contempt," including paying all past due child support and obtaining the drug test required in the September 2015 order and that he had "communicated or reasonably attempted to communicate with the child within the past year."

At the August 2017 hearing, the mother testified that after the contempt order was issued, the father regularly texted her to schedule visitation, but she denied his requests because he had not provided proof of a clean drug screen. On April 5, 2017, the father's attorney wrote to the mother's attorney, providing proof of the father's September 20, 2016 clean drug screen and requesting that the father begin the graduated visitation schedule. The mother, however, continued to deny the father's repeated requests for visitation because "the drug screen took way longer than his allotted time[,] and we still [had not] done the counseling sessions." The mother

4

testified that "[they] haven't really spoken to [the father] since" the adoption petition was filed, even though he called "every day pretty much. . . ."[3]

The mother also testified that B. M. W. saw his paternal grandparents and had a "good relationship with them," and they passed along gifts to B. M. W. from the father. According to the mother, the grandparents and the father attended B. M. W.'s sporting events up until two years before the hearing. After the adoption petition was filed, the mother "rejected" the grandparents' requests to attend B. M. W.'s sporting events because "they were very upset and angry[,] . . . and it's not something I need to bring around [B. M. W.] or myself. I was eight months pregnant at the time"; the mother told the grandparents that she would take the child out of the game if they or the father came to watch.

At the hearing, the father testified that after he and the mother separated, he spent a lot of time with B. M. W. The father concedes, however, that after the mother started prohibiting his visitation, he wrongfully stopped paying child support. After the contempt order, the paternal grandfather sold the family's only vehicle so the

_____

[3] The mother testified that B. M. W. (who was six years old at the time of the hearing) did not want to speak to the father, and she did not make him, explaining that before the adoption petition was filed, the father told B. M. W. on a phone call: "I'm sorry your mom won't let me see you. And I'm going to see you real soon[,] and it's her fault."

father could pay the purge amount and avoid jail, and the father worked a second job to repay him. The father, who is legally blind, worked in construction, making $10 per hour at the time of the contempt order. According to the father, he was initially unable to pay the $275 for the drug test the court required because he was paying the arrearage and continuing child support payments, and he had difficulty scheduling the test because he frequently worked out of state. The father maintained that he did not understand that his visitation with B. M. W. was conditioned upon him attending counseling; he believed, until the day of the final hearing, that he could begin visitation as soon as he obtained a clean drug screen and that he would undergo family and/or individual counseling when and if the counselor required it. Nevertheless, he attempted to schedule counseling but was only offered Wednesday appointments, which he could not attend because of work. The father also testified that he called the mother's phone regularly to speak with B. M. W., but he was only able to speak with him once or twice in the three years before the hearing.[4] The father

---

[4] The father submitted screen shots from one of his phones showing what he explained were 58 calls to the mother to speak to B. M. W., as well as texts to the mother and logs of calls to her in 2016 and 2017. According to the father, the exhibits do not reflect all of his calls, many of which were made from different phones.

denied ever telling B. M. W. that the mother was preventing them from seeing each other.

The paternal grandmother testified that she had visited with B. M. W., who said that he loves the father, and she has passed along gifts to him from the father. Both paternal grandparents witnessed the father's repeated unsuccessful attempts to speak with B. M. W. on the phone.

Although the attorneys had difficulty determining the precise amounts, they agreed at the final hearing that the father had been making regular monthly child support payments since the petition was filed, but was still in arrears in the amount of approximately $1,100.[5]

On October 26, 2017, the superior court entered an "Order Granting Petition for Adoption and Terminating Father's Parental Rights." Therein, the court made factual findings, including that: on September 10, 2015, the father was ordered to provide a clean drug screen and maintain counseling to resume visitation with B. M. W.; he failed to obtain the drug screen until August 2016 or to undergo individual counseling; his claims that he could not pay for the drug screen were "unpersuasive"

---

[5] The father testified that he believed he was current on his child support, but realized while discussing the matter with the attorneys in the case that "[his] math may have been off on the original contempt order."

7

because he failed to ask to borrow money or to get a second job to pay for it; his claim that he didn't understand that the contempt order required him to obtain counseling "is contrary to the plain reading of [the o]rder and equally unpersuasive"; from July 21, 2015, through the date of the final hearing, the father had no visitation with B. M. W.; and although the father "has had telephone contact with [B. M. W.,] . . . the contact often resulted in the [f]ather making inappropriate comments to [B. M. W.] and [the f]ather blaming the [m]other for his inability to see [B. M. W.]." The trial court determined that the father's telephone contact "has not been meaningful . . . or supportive for [B. M. W.]." The court then concluded that "[s]urrender or termination of the [f]ather's rights were not required as a pre[]requisite to the filing of this [p]etition because there is clear and convincing evidence that [B. M. W.] has been abandoned by the [f]ather." The court also found that the stepfather had been providing for B. M. W.'s education, health, and welfare and had "developed a meaningful and parental bond with [B. M. W.], and then concluded "[a]fter considering the physical, mental, emotional[,] and moral condition and the needs of [B. M. W.], [that] the granting of this [a]doption is in the best interest of the [c]hild."

1. The father contends that the trial court erred by terminating his parental rights without his consent. We agree.

8

Former OCGA § 19-8-6 (a) (1) provides that a child whose legal parents are living, but not married to each other, may be adopted by a stepparent only when the other parent voluntarily surrenders his rights to the child and consents to the adoption. Former OCGA § 19-8-10 (a) (1), however, provides that such surrender is not required if

> the court determines by clear and convincing evidence that the . . . [c]hild has been abandoned by that parent . . . and the court is of the opinion that the adoption is in the best interests of that child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.

In the alternative, under former OCGA § 19-8-10 (b), a court may grant an adoption without a parent surrender

> if that parent, for a period of one year or longer immediately prior to the filing of the petition for adoption, without justifiable cause, has significantly failed: (1) To communicate or to make a bona fide attempt to communicate with that child in a meaningful, supportive, parental manner; or (2) To provide for the care and support of that child as required by law or judicial decree, and the court is of the opinion that the adoption is for the best interests of that child.

9

Regardless of which subsection a court applies, "[i]n all cases wherein [OCGA §] 19-8-10 is relied upon by any petitioner as a basis for the termination of parental rights, the court shall include in the decree of adoption appropriate findings of fact and conclusions of law relating to the applicability of [OCGA § ] 19-8-10."[6]

Here, the stepfather alleged that the written surrender of the father was not necessary because the father had for a period of at least a year immediately before the petition was filed, "without justifiable cause . . . failed to communicate or make a bona fide attempt to communicate with [B. M. W.] in a meaningful, supportive parental matter [sic] and has further failed to provide care and support of the child as required by law or judicial decree as contemplated in OCGA § 19-8-10." Although the petition did not specify the subsection of the Code section upon which the stepfather relied, the language he used precisely tracks that of former OCGA § 19-8-10 (b).

The superior court's order likewise did not mention former OCGA § 19-8-10 specifically. But in the absence of the father's voluntary surrender, that Code section is the only possible basis for granting the adoption petition. As previously stated, the trial court found that "there is clear and convincing evidence that the [c]hild had been

---

[6] OCGA § 19-8-18 (b) (2017).

abandoned by the [f]ather." This language tracks subsection (a) of the Code section, as does the trial court's conclusion that granting the adoption was in B. M. W.'s best interest "[a]fter considering the physical, mental, emotional[,] and moral condition and the needs of [B. M. W.]."[7] Thus, the trial court apparently determined that the father had abandoned B. M. W. as referred to in former OCGA § 19-8-10 (a).

(a) *Former OCGA § 19-8-10 (a)*. The trial court erred by basing the adoption on former OCGA § 19-8-10 (a).

(i) First, the evidence does not support a finding of abandonment. "It is well settled that adoption laws must be strictly construed in favor of natural parents."[8] Because the superior court based the adoption upon the legal conclusion that the father had abandoned B. M. W., there must be in the record "clear and convincing evidence of an "actual desertion, *accompanied by an intention to sever entirely*, as far as possible to do so, the parental obligations growing out of the [parent/child

---

[7] Former OCGA § 19-8-10 (b) requires that the court determine "that the adoption is for the best interests of that child," omitting any language about the "physical, mental, emotional, and moral condition and needs of the child." We note that OCGA § 19-8-10 (b) (2018), effective September 1, 2018 (which does not apply to this case), does include such language.

[8] (Punctuation omitted.) *Smallwood*, 292 Ga. App. at 177 (2).

relationship], and forego all parental duties and claims."[9] Here, the father paid child support (albeit at times late and/or pursuant to the contempt order), ultimately provided proof of a clean drug screen a year before the final hearing, sent gifts to B. M. W. through the grandmother, requested through counsel to begin visitation, and attempted to contact B. M. W. on an almost daily basis for the year preceding the final hearing.

> The relevant undisputed evidence in this case, as recounted above, does not support a finding that the [father] ever acted, or failed to act, with the intention to sever entirely [his] parental obligations and claims to [B. M. W.] Thus, the trial court was not authorized to grant the adoption petition, pursuant to OCGA § 19-8-10 (a) (1), based upon a finding that the [father] had abandoned [B. M. W.][10]

(ii) Furthermore, the stepfather's adoption petition neither referenced nor tracked the language of former OCGA § 19-8-10 (a), and therefore, the father

> received no notification that [he] must be prepared to show cause why [his] parental rights should not be terminated pursuant to subsection (a).

---

[9] (Punctuation omitted; emphasis in original.) *In re Marks*, 300 Ga. App. 239, 243 (1) (684 SE2d 364) (2009), quoting *Hall v. Coleman*, 264 Ga. App. 650, 653 (1) (592 SE2d 120) (2003).

[10] *Marks*, 300 Ga. App. at 243 (1). See also *Griffith v. Brooks*, 193 Ga. App. 762, 766 (1) (389 SE2d 246) (1989).

. . . By . . . basing its adoption decree on grounds that [the father] was never properly notified of, the trial court failed to strictly construe [former] OCGA § 19-8-10 in favor of [the father], and such an erroneous decree must be reversed.[11]

(b) *Former OCGA § 19-8-10 (b) (1)*. "To the extent that the trial court's order could be read to imply that the adoption was authorized under a separate provision, [former] OCGA § 19-8-10 [(b) (1)], we find that there is insufficient clear and convincing evidence to support such a conclusion."[12]

The adoption order did not include a specific finding that the father's failure to communicate with B. M. W. in a meaningful, supportive, parental manner was "without justifiable cause" as required by former OCGA § 19-8-10 (b) (1). More importantly, the evidence did not support such a finding. There was unrefuted evidence that the father called the mother's phone on an almost daily basis in an attempt to speak with B. M. W., but his efforts were thwarted by the mother, who neither required nor encouraged the child to speak to the father. The mother similarly

---

[11] *Smallwood*, 292 Ga. at 177 (2).

[12] (Emphasis omitted.) *Marks*, 300 Ga. App. at 246 (3).

13

refused to allow the father to have visitation with the child.[13] Thus, she "has failed to demonstrate that the [father's] failure to communicate with the child for the requisite statutory period was without justifiable cause."[14]

Accordingly, the superior court erred by terminating the father's parental rights and granting the stepfather's adoption petition over the father's objection.

2. Based on our holding in Division 1, we need not address the father's remaining enumerations.

*Judgment reversed. Dillard, C. J., and Mercier, J., concur.*

---

[13] To the extent that the trial court and/or the counselor intended to require that the father undergo counseling *before* beginning visitation, that requirement was not clearly stated in the September 2015 contempt order; instead, the provision of the parenting plan addressing counseling was included in the section regarding circumstances arising *after* overnight visitation began. Even assuming, however, that the father was required to obtain counseling before beginning visitation, his failure to do so did not prohibit him from having telephone contact with B. M. W., which he repeatedly attempted to do, as conceded by the mother.

[14] Id. at 244 (2) (a).

14